You may be seated. The next case for argument is Precon Development v. Corps of Engineers. Mr. Cale, glad to hear from you. Good morning, Your Honors. Good to be here again. Not really. We were here a few years ago and, of course, Justice said you were a part of that panel that heard our argument back at the time that the Corps had not established jurisdiction in the Clean Water Act over our property. This Court agreed with us, remanded, and here we are back again because the Corps continues to assert we believe improperly jurisdiction over our property. I was a psychology major 40 years ago and I learned back then that people, particularly men, learn best through visual cues, through visualization. So if I may entertain the Court with a visualization. Not us. We learn through intellectual discussion up here on this bench. So to visualize what we're talking about here, since you can't go ahead and actually see the property, let's make this courtroom into the watershed of the Northwest River. 161 square mile watershed. A very flat, large bowl. And the property under question today, our property together with what the Corps has considered to be similarly situated wetlands, if it was in this courtroom, would be an area approximately, or actually, according to Dr. Cahoon, considerably less than a 3 by 3 foot square right back in the corner back here. Seven miles from our property, down two man-made ditches, down to the Northwest River that sits in the middle of the watershed here where the podium is. So the Corps' challenge, the Corps' requirement, according to Justice Kennedy, is to come up with substantial evidence that that little area of wetlands back in the corner has significant effect on the water quality of the Northwest River here. Tough task. I suggest insurmountable. After many years of studying the property, they couldn't come up with any such evidence. Back last time we were here, this court found that there was no evidence supporting clean water act jurisdiction. No document supporting clean water jurisdiction. In the last case, when we wrote, we said this, we do not even know if the Northwest River suffers from high levels of nitrogen or sedimentation, or if it is ever prone to that. What do we now know about those two points that we didn't know then? We know as to sediment, that there is no evidence in the record. It is void as to any evidence that any sediment makes its way from these wetlands down to the Northwest River. We also know that there is no evidence in the record that the Northwest River suffers from excess sediment. It's void as to that question that you put to the report. He explains why there's no sediment coming down here, because there's a seven-mile flow down this ditch. When the water gets down to the Pleasant Grove Swamp before it gets into the Northwest River, the water slows down, spreads out, so that if there was any sediment that made it down seven miles, it gets to Pleasant Grove Swamp and it would distill out before the water then went to the river. So in response to that first area of inquiry that you put forth as to sediment, there is no effect, there's no connection that's significant as to what those wetlands do to the Northwest River. A point relative to that, too, you may recall seeing that the Corps argued in its jurisdictional determination memo, it says, well, yeah, but those wetlands, even though they are less than five-tenths of one percent of the contributing watershed, oh, yeah, but they act as a sink for surrounding areas. Well, that's argument as opposed to evidence. And the evidence in the record, not challenged, and actually the Corps acknowledges this in its memorandum, is that this small area of wetlands is on the crest, it's on the rim of this big bowl, and certainly when you have wetlands up 20-plus feet elevation, they can't act as bowl of nitrogen. That was another part of our inquiry. Yes, Your Honor. Again, the record is void of any evidence whatsoever that that little area of wetlands has any effect, either positive or negative, on the nitrogen content of the river. The record reflects in the DEQ report, and of course that's the big thing that supposedly has been found since last time we were here, was a report by the DEQ talking about the Northwest River and says, oh, gosh, the river suffers from low dissolved oxygen caused by excess phosphorus from human activities, failed septic systems, agricultural activity. That's what the DEQ report says. As to nitrogen, there's nothing in that report, there's nothing in the record that supports any notion that nitrogen is in excess in the river, and in fact, the DEQ report tests for nitrogen, chose tests for nitrogen, and showed the levels of nitrogen in the Northwest River, and in a separate DEQ report that Bay Environmental talks about in the administrative record, talks about the level of nitrogen in the river and the levels of nitrogen that are approved concentrations for drinking water. And the levels of nitrogen in the Northwest River range between 6 to 13 percent of the nitrogen levels approved for drinking water. Aren't you taking those in isolation though? Isn't the effect supposed to be the combined effect of both phosphorus and nitrogen? The fact that we don't have a problem with nitrogen today, you say, in the river, doesn't mean that the wetlands don't help to ameliorate a problem with respect to that element in the future. No. The magistrate judge and district court judge brought up one of that. They say, well, gosh, everything, all these are nutrients. Nitrogen is a nutrient, phosphorus is a nutrient, so therefore we're going to take some kind of a cumulative approach, and since there's a problem with excess phosphorus, therefore any nitrogen ergo must be relevant to this nutrient problem. But anybody who's bought a bag of fertilizer knows that nitrogen is a separate nutrient from phosphorus, separate from potassium, the three elements of fertilizer. And you say anybody who's bought a bag of fertilizer, is there any evidence in the record that somebody bought a bag of fertilizer and made that point below? Or made any point? No, but what's not in the record is any evidence whatsoever, not a single sentence in any report in the record. There's not a single sentence that says the nitrogen trapping function of these wetlands have any effect that's significant on the river. That's the focus here. The focus here, as the court directed last time, is does the river suffer from excess phosphorus? It doesn't have excess nitrogen, and there's nothing in the record. You're taking those elements in isolation, and my question was, is it appropriate to consider these elements working in tandem to produce this low oxygen? There's not a shred of evidence, Your Honor, not a sentence in the record. I'm going to be surprised when the other side gets up and says something to the contrary, but go ahead. There's not a record that says, no evidence that nitrogen, that a 13% approved water, drinking water level of nitrogen, that that has any cumulative effect on the level of phosphorus that's in the river. There's no evidence, and that's the requirement. The court has to have substantial evidence that the nitrogen in the, that the nitrogen trapping function of these wetlands have a significant effect on the river. Keep in mind, never forget that the wetlands we're talking about represent considerably less than 5 tenths of 1%, less than half 1% of the contributing water. But it wouldn't matter if there were evidence that that 0.5% contributed heavily to nitrogen. Absolutely right. If this was a keypone plant dumping out something really a bad substance, then it could be even less than that, but it's rainwater. It's a natural area. There's no evidence that anything comes off of that property, but to whatever extent something comes off of it, it's nothing more than rainwater. And it's rainwater that landed on that less than one half 1% of the watershed, and whatever rainwater landed there, the rain landed on the other 99.5% of the property. And so the question is, which it is, when it rained that day, did those wetlands have a significant effect on the water quality of the river? It can't. It's a task that the court can never meet, because if you take the accepted fact that there's nitrogen coming down from rain, with rain, hitting in this watershed, the question is, or do you have substantial evidence that the less than one half of 1% of nitrogen that fell on those wetlands, that the trapping function by that small area had a significant effect on the river? Yeah, but contrary to that argument, if the court has evidence, then they have evidence. Absolutely. And that's the point, and I'm certainly aware of the fact that the administrative deference requires evidence to be considered and favored that the court comes up with. But just like last time we were here, there is no evidence. It's void. Is your argument that based on the size of our parcel, that it's hard to believe there could be a nitrogen impact on the river? But beyond that, there just isn't any evidence anyway. It's the size, Your Honor. Is there evidence? I mean, is that your argument? Yes, Your Honor. The size and the distance. As Dr. Coon talked about, it's not just such a small area. What about the other prong about ever prone to flooding? Wasn't there some evidence of flooding in the record, maybe twice in 50 or 100 years, caused by tidal winds or something? Exactly. Jim Cahoon, no relationship to Dr. Cahoon, Jim Cahoon in his report, which is their record, has done a lot of work in the area. He's familiar with and has done work, as the report says, where he's been dealing with the Northwest River for over 15 years. And he made the, and there's the qualitative evidence, the observation, that in that 15 years, the river has only flooded on two occasions, both occasions, wind-driven high tides, not from any kind of rainfall. Dr. Cahoon came to a similar conclusion that because of the distance away, because of how small the area is, that any rainfall that would fall onto that area by the time it flows seven miles, some goes... Let me ask this. So, as I understand your response, and I'm going to ask the government the same thing, and you'll get a chance to respond to that. But barring from Judge Diaz, let's see how surprised we are if they disagree with you. But we did say we don't even know if the Northwest River suffers from high levels of nitrogen, and you say there's nothing in the record to show that it does. Or sedimentation, you say there's no evidence in the record to show that. Or being prone to flooding, and you say there is no evidence to show that. As a matter of fact, there's evidence to show it's not prone to flooding. Now, all right, looking at the issue of cumulative levels and all we have to look at, so what, is my next question to you? You know, those three things weren't answered. Does that decide the case, or is that just something we look at? Is it critical? What is your... You know, put all that together for us. It decides it because those three areas of focus, sediment, flooding, nitrogen, areas that you focus... The court said, CORE, come up with something. For example, so you weren't giving an exclusive list of what the CORE had to find, but if you take a step back from that, was there anything in the record that shows a significant effect on the chemical, biological, or physical? That's what the requirement is. Those layers of wetlands have to significantly affect the chemical, biological, and physical characteristics of the Northwest River. In any kind of manner, and I'm telling you, Your Honor, that there is nothing in the record of any effect, including sediment, nitrogen, and flooding. There's no, there's no nothing in the record. It's void. It was void last time around. The only thing new, they talked about all that, the EQ report that talks about low dissolved oxygen due to phosphorus from human activities. There's nothing else new. The record is full of references to photographs and all from before we were here last time. Well, that doesn't matter because you've already determined that adds up to zero. So, Judge, not just those three areas, but there's void of any evidence of any effect. Not to be confused with argument. Attorneys argue the requirement is substantial evidence of a connection, and there just simply isn't one. Well, the one issue you haven't talked to, you haven't spoken to, is this issue of flow and its significance to this analysis. Do you want to address that? Well, the relevance of flow or lack of relevance is certainly under old law, is it possible for a molecule of water to get from our wetlands down to the Northwest River? Let's go with we can't argue that that doesn't happen. It's never been tracked, but it can flow. But the question isn't, as it used to be, could there merely be a hydrologic connection? That's not the law anymore. The connection, the flow has to, in some manner, significantly affect the river. Significantly affect it how? Maybe by making a flood. Maybe by making it not flood. If it's a big enough area we're talking about that retains water so it doesn't flood, that'd be a significant effect. Otherwise, again, any indication that that hydrologic connection, that flow, affects the chemical characteristics of the Northwest River? No evidence. Biological characteristics? No evidence. Physical? No evidence. Does water flow down a ditch seven miles to get to the river? Sure. Not the question. I see my time is about out. You've reserved time. Thank you. Thank you very much. Ms. Sprague, I'd hear from you. Good morning, Your Honors. Mary Gay Sprague, representing the United States Army Corps of Engineers. We do disagree that there is no evidence in the record. You understand the question, don't you, from the last time announced? What I'm asking is the evidence to show significance, the best evidence as to high levels of nitrogen, sedimentation, and flooding, prone flooding. Right. But Your Honor, with respect to nitrogen, to start with that, that's gotten a lot of focus. I think the issue there is nutrients. Nitrogen was used as an example. I don't think this court was making a determination of what the nutrient was that possibly was of greater significance to the Northwest River. And the Corps has developed a much more robust record on the condition of the Northwest River. The Virginia Department of Environmental Quality has extensively documented the low dissolved oxygen impairment of the river. Do you have any evidence on nitrogen, any additional evidence on nitrogen? Right. Your Honor, the nitrogen calculations have not changed significantly. So the answer would be no, you have no new evidence on nitrogen. Your Honor, there's new. You have to answer that question. Do you have any new evidence on nitrogen? There's new evidence about the study of nitrogen and phosphorus in the watershed. Do you have any evidence about nitrogen as it affects the Northwest River from this parcel of land? The calculations of the nitrogen have not changed, but what we do see. I'm not asking that because I don't really understand all that. I'm asking, does this record now contain any new evidence of impact of nitrogen and its presence in the Northwest River? Insofar as it's known that it's necessary to control nitrogen because... Let me ask you that now. I said actual presence. I didn't mean you lose. I'm just asking. This is a factual question. Is there any further evidence in this record now about a flow of nitrogen or the presence of nitrogen in the Northwest River that is somehow related or could arguably be related to that parcel of land? I think the answer is no, but I want to see what you say. Your Honor, I don't think the evidence on nitrogen has been explored. Okay, I'll take it. So you won't say no, but the answer is there's nothing additional that's been added. We understand the importance of controlling nitrogen. Because the river is already impaired. Because the river is impaired for low dissolved oxygen. And what we do see... Let me finish. The fact that the nitrogen levels may be in isolation acceptable doesn't mean that if the wetlands help to keep those levels at an acceptable amount, whatever that amount is, that it doesn't have a significant effect. That's correct, Your Honor. And I think... Well, that was going to be my next question. But you wouldn't answer my first question. I'm sorry, Your Honor. Remember when I said that doesn't mean you're wrong. I was just asking a factual question. Just let me tell you, as I see the record, I see no specific new information about the presence of nitrogen. You won't say that, but I think that's the record. Your Honor, why I'm resisting is because I think the overall problem that the court saw with the last record was the lack of context. That the Northwest River itself was a black box. Admittedly, that record did not give you much, if any, information about what its qualities were and what the stresses were. Just let me say this and then you can move on. I ask that because the court certainly last time specifically mentioned nitrogen, didn't it? And you may come back and now say, we have no additional information on nitrogen, but Your Honors, we don't think that is the be-all and end-all of this discussion. And so I was going to ask you the second question. I haven't heard the answer to the first one, but now the second one is, notwithstanding as I read the record, there is no additional information about nitrogen per se, in and of itself. I ask you, what would you respond to the court, though, on the significance of that quote? That's where you wanted to get anyway, wasn't it? Yes, Your Honor, I'm sorry to delay you in getting to that question. The significance of the wetlands, I think it has been demonstrated more clearly as to the phosphorus effect of the wetlands themselves and the tributary. And it is the phosphorus that is believed to be the primary contributor to the low dissolved oxygen, and that is the focus of the controls. And the record demonstrates both the effect of the wetlands and the tributary in the relevant reach. PRECON argues that because the wetlands are at the top of the drainage divide, they can't collect any runoff over land. And that's not correct, because there is the top of the drainage divide, and it's sloping down towards the tributary, and the wetlands are adjacent to the tributary, and there is upland, agricultural and residential and commercial land upland of the wetlands that are lining the tributary. So they are catching the runoff that's coming from these developed areas. There's, excuse me, 1,340 some acres in the relevant reach, and 448 acres of those are wetlands, and those are along the tributary. What's the interplay between nitrogen and phosphorus itself and this parcel of land? How do we make that connection? You understand my question? Right. They're both potential nutrients that can cause low dissolved oxygen. It appears that the systems are working to remove the nitrogen that's being deposited from the atmosphere and other sources because we are not seeing exceedances of nitrogen in the water samples. That's correct. We are seeing exceedances of the phosphorus, and so that's the effort of the regulatory control. And the record documents how these wetlands, if they're left intact, are contributing to removing this phosphorus. There are outfalls that go into the tributary. The record documents how the tributary has organisms that transform the phosphorus so that it doesn't go downstream. And again, it's hard to prove that it would, except by general understanding of systems, that the phosphorus that adheres to sediments is retained in the sediments because of the bumpy bottoms of these streams instead of just ball washing downstream. Then let me see if I understand, because I'm really trying to follow this so I can understand it. Is it that, in your analysis, phosphorus can just be substituted for concern about nitrogen? Or is it that phosphorus, which is a problem, it will be aggravated if there's any change wherein nitrogen could be added to the mix incrementally? Or that somehow there is an interplay between phosphorus, nitrogen, and anything else that could be added, which would further worsen the situation of DO, at least DO in that river? I think all of the above. I mean, nitrogen could become the problem if the ecosystem wasn't working to neutralize its effect. Phosphorus is the problem. Is that based on any It's based on general literature of water quality, not specific to the Northwest River. And what we do see in the expanded record, and again, the problem last time was the Northwest River was a black box. The expanded record looks at the City of Chesapeake's plan for the Northwest River, which provides much more information about the river, that it's used as a drinking water supply, it's used for recreation and fishing, and the important wildlife habitat that it provides for both plants and animals, terrestrial and aquatic. The record gives more attention to the Virginia Department of Conservation and Recreation, their conservation plan for the southern watershed area that provides much more information about the value of the river and the stresses on the river. There is more information from the City of Chesapeake's stormwater management department. When the court said we do not even know the Northwest River suffers from high levels of nitrogen or sedimentation, or if it is ever prone to flooding, the court had to be a general commentary on lack of information in the record and not information on those three points, just those three points. That's correct, Your Honor. The court generally stepped back to provide an overview. Most fundamentally, the expanded record shows that the Northwest River is a product of the wetlands. There wouldn't be the Northwest River without the wetlands. And your argument would be the court would still win this case even if the court never specifically addressed any one of those three things, as long as they show significance in some way. Yes, Your Honor, that is our position. To me, the issues that are clearest in the new record are the contribution of the base flows of the river. The river is a creature of the wetlands. This 130,000 acre watershed was once almost entirely forested and with wetland forests. And it's the wetlands that hold the precipitation that slowly release it that make the river. So your analysis is more qualitative than quantitative. Your Honor, it still is more question than is there a threshold percentage. And the court would say there's not. We have here 103,000 acre watershed. We have remaining in the Virginia portion of the watershed about 28,000 acres. These are 448 acres we're looking at. That's 1.6% of the wetland acres remaining in Virginia. On the one hand, you could say 1.6%. That doesn't seem like a lot. The river could probably survive without if you cut down the next 1.6%. But the issue is, and the court uses the analogy, you have columns supporting the structure. You have the wetlands all together supporting the river. And maybe you could get along without 1.6%. But what about the next and the next? Has the court ever conceded it doesn't have jurisdiction over something? Yes, Your Honor. Two years ago this court heard a case called Deerfield Properties in which the court held that it did not have jurisdiction and a group who thought that it should claim jurisdiction. There was no connection or no flow whatsoever to any water in that case? That was what the court held, Your Honor. It was just an isolated pond that had no outflow. Right, Your Honor. Has there ever been any water without flow that the court held they didn't have jurisdiction? If it's adjacent to a tributary like these? No, I didn't say that. I didn't add that in there. Can you think of any case where there's some body of water, no matter how small, that has some type of outflow to another source of water that the court would say it doesn't have jurisdiction over? Your Honor, I don't have an encyclopedic knowledge. Do you know of any yourself? No. When I was asked that question I was given Deerfield Properties as the example. The core regulators. I mean there are others but... There are not many, are there? But by the way now, that's how you see your emission. Isn't that correct? That's correct, Your Honor. And here, to get back to the Virginia Department of Environmental Quality work on this... Before you get back to that, I think I heard you say in response to Judge, one of Judge Shedd's questions that any one of these factors in isolation could be enough to satisfy the requirement for jurisdiction. Is that your position? Your Honor, theoretically, but they don't work in isolation. Well, that's right. So, I guess what I was saying, it wouldn't have to be necessarily nitrogen, but the properties that create the base flows are the properties that mitigate the flood flows. And the organisms that live in the soil and in the streams are also part of the system that removes the... The reason I ask that is I don't necessarily find the evidence on flooding to be compelling. There is some evidence, I think, that supports your point. But Precon has, I think, a good argument that that by itself would not be enough. But you don't take that in isolation. You look at all the different factors in this case and you decide whether or not collectively, cumulatively, they amount to the significant nexus that's required. Right. Your Honor, we agree with that. Although even with the flooding, Precon's calculations were that if you took a rainfall, a heavy rain on these 448 acres for four days, you would raise the level of the entire river by 2.14 inches with conservative calculations. But the point is that it's not just raining on these 448 acres. It would likely be raining throughout the watershed. Your view is on these individual factors. The Court's view is the absence of one is not enough to destroy your jurisdiction, but the presence of one could be enough to establish your jurisdiction. Isn't that your position? I would say yes, but. I would say you would say because I think if you, I guarantee the Court would be in here arguing if the only thing in the record was flooding, that that body calls flooding and rising the level. You would think that would establish jurisdiction, wouldn't you? Yes, Your Honor. Or that body. I know you say they act together, but I'm just saying you analyze this. One, the absence of one is not enough to defeat your jurisdiction, but the presence of one by itself could be enough to establish it. If the flow, whatever it was from there, as limited as it was, if it tremendously created an increase in nitrogen and therefore more DO problem, you would assert jurisdiction, wouldn't you? I believe so, Your Honor. Let's talk about the percentage, small percentage argument that Precon makes. I take it that this is the Court's policy. You try to prevent developers from breaking up a piece of property into very small pieces in order to develop it, and therefore allowing that to happen ultimately would affect the wetlands. If you did each little piece separately, yes. Is that a policy in play here? Your Honor, I think that goes more to the permitting policy more than the jurisdictional determination. What happened here is that with a planned unit development, a permit should be sought for the entire planned unit development at once, and that is to allow the Court to get the overall picture and make a decision and not just do one cul-de-sac at a time and have a separate permit for each of those. I don't know that it's as significant at the jurisdictional stage because there is the concept of at this point the relevant reach and the similarly situated wetlands in the region, so that the Court is looking at all 166 remaining wetland acres on Precons property within the watershed of the Northwest River, even though they broke their permit application into pieces. I would like to just talk briefly about wildlife and the benefits of the wetlands for breaking down, again, the same properties that have the vegetation and the downed material and retaining the water leads to conditions where that organic material is broken into particles, which are then washed into the tributary, and that is the food for the smaller aquatic organisms, which are then eaten by the bigger aquatic organisms and so on up the food chain. That process is being served, and we do see in the expanded record what a valuable resource the Northwest River watershed is for both plants and animals. The effect of the wetlands on the flood levels in the main channel of the Northwest River is not a lot more robust than it was with the last record, but I think what is better documented is the effect that the wetlands have on preventing flooding down St. Bride's Ditch, and that flooding down St. Bride's Ditch disrupts the ecosystem and the nutrient chain that then does disrupt the aquatic organisms in the river, because that food chain is then broken when the flooding moves the sediment downstream and basically smothers the aquatic organisms in the base of the stream. So I apologize for being obstinate about the nitrogen at the beginning of the argument, but it is our... I didn't say you were obstinate. I said I just couldn't get a definitive answer. But by the way, that would not have been the first time that that happened. But thank you very much. Thank you, Your Honor. Thank you very much. Ms. Gail, you reserved five minutes. Thank you, Your Honor. A few points to touch upon, Justice Floyd. I believe what your question to opposing counsel at the end, talking about this little piece of property, some kind of words like that. Let's be clear. This less than one-half or one percent of the property we're talking about, that's not the property that PRECON owns. That is the size that the court came up with when they took PRECON's property and added to it other wetland areas that they deemed to be similarly situated. So that's the whole ball of wax. According to Justice Kennedy, you have to look at all of that area, 148 acres, and you look to see, does that area significantly affect the river? So that one-half or one percent is the totality of the area that Justice Kennedy says you look at. Now, opposing counsel talked about Dr. Cahoon's calculations about rainfall and talking about the effect on flood control. She repeated what the magistrate judge unfortunately did back in his report. Dr. Cahoon says, he does some calculations about rainfall and talking about the effect on flood control. And he does say, okay, in a hypothetical 10-year storm, the number of gallons of rain that fall on these areas, that could raise the Northwest River 2.14 inches. And that's the part that the magistrate judge quoted as supporting a substantial connection. What the magistrate judge failed to do is finish up the sentence, finish up the paragraph where Dr. Cahoon says, yes, it would raise it 2.14 inches until you take into consideration that those wetlands are less than five-tenths of one percent of the contributing surface of the water area. That any rain that hits on those wetlands has to flow seven miles. And some of that then sinks into the ground. Some of it's evaporated. It then goes to the Pleasant Grove Swamp where it spreads out and again evaporates or goes down the ground or is sucked up by plants. He goes through all those qualifications, he says, and furthermore, during that seven-mile path down a ditch, some of that rainwater that made its way off of these wetlands go up into contributing tributaries, leading Dr. Cahoon to then say, and for all those reasons, starting with the 10-year flood type of calculation, I conclude that there is no significant effect that those wetlands have on flood control. You've got to read the whole paragraph. You don't stop after a few words and a sentence. Well, and that's why I said that I don't know that the flooding issue is all that compelling for the Corps. In part, not just because of that, but because of their own evidence doesn't seem to be all that compelling as to flooding. But what I asked Ms. Sprague was, and I'll ask you the same question, you don't look at these in isolation. You have to take the cumulative effect of the evidence supporting jurisdiction and decide whether or not there is a significant nexus. Is that not correct? Absolutely. But if you add zero to zero to zero, you still have zero, cumulatively. Nitrogen. Let's sit back on that. Big, big point. Nitrogen is a different element from phosphorus. Like gold is not the same as silver. It's a different fundamental basic element. There is no evidence, the record is void of any evidence whatsoever that the nitrogen trapping functions of these wetlands, that they function to such a degree to have any significant effect on the water quality of the Northwest River. That's the test. And the record is void of any such evidence. But let's just engage in a hypothetical. Are you disputing that they have any nitrogen trapping effect? No. I said any meaningful, any significant. But the problem is you've already got a showing that the river is impaired. So any contribution, meaningful or otherwise, would exacerbate that problem. Absolutely not. Absolutely not. The DEQ is abundantly clear in their report, their exhaustive report, that the condition of the river is due to excess phosphorus, the phosphorus coming from human activities, failed septic systems. I agree with that. But you can't then say if, in fact, you then allow nitrogen to come into the river, would that not have a, would that not exacerbate the problem? There is no evidence whatsoever. I didn't ask you whether or not there was evidence. Do you agree with that proposition? No, I don't. No, I don't. The nitrogen content of the river is at most 13 percent of the approved nitrogen content for drinking water. I understand that. But I'm saying if, in fact, nitrogen finds its way into the river in combination with the already negative effect of phosphorus, does that not substantially increase the problem with respect to the impairment of the river? There's not a shred of... I understand that. But I'm just asking that question. If you wanted to make up the proposition that nitrogen somehow had a cumulative effect with phosphorus, if you wanted to make that assumption, then your point has merit. But there's no such basis to support that proposition. Yeah, I understand your point that you don't think there's any evidence, but the proposition is correct. If you start with the presumption that nitrogen, that the existence of nitrogen has some kind of accumulative, exacerbating effect on the level of phosphorus, if there was a sentence of evidence in the record that supported that, you'd have an argument. But there is none. There is none. They are separate. And for that reason is why the DEQ said these wetlands aren't a problem with respect to the river. The DEQ makes that affirmative statement in response to CORE inquiry and says the problem isn't wetlands, the problem isn't natural areas like wetlands, the problem is human activities. You run over now. We'll give you five seconds to wrap up if you want to take five seconds. It's been 13 years, Your Honor, since my client's property has been tied up. Time has come for this court to determine that this property is beyond clean water act jurisdiction. Thank you. Thank you very much. We'll have the clerk adjourn the court. Then we'll step down and greet counsel. This honorable court remains adjourned until tomorrow morning at 830. God save the United States and this honorable court.
judges: Dennis W. Shedd, Albert Diaz, Henry F. Floyd